IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 3:08-cr-28 |
| | ) | |
| -vs- | ) | **MEMORANDUM OPINION ON** |
| | ) | **COURT'S SENTENCING GUIDELINE** |
| Adenkunle Olufemi Adetiloye, | ) | **CALCULATION** |
| | ) | |
| Defendant. | ) | |

## INTRODUCTION AND PROCEDURAL BACKGROUND

On November 22 - 23, 2011, and December 1, 2011, the parties presented evidence related to sentencing issues. Following the evidentiary hearing, the Court allowed each side to submit a supplemental sentencing memorandum (Docs. #111 & #112). Sentencing is currently set for January 23, 2012. The Court advised the parties that it would determine the sentencing guideline range in advance of the sentencing hearing. The Court, having had an opportunity to fully consider all of the evidence that is in the record, including that which was presented at the evidentiary hearing, as well as the parties' legal arguments, now issues this memorandum opinion on its determination of the appropriate advisory guideline range.

Defendant Adenkunle Olufemi Adetiloye (hereafter "Adetiloye") pled guilty to an Information charging one count of Mail Fraud, in violation of 18 U.S.C. §§ 1341 and 2. He faces a statutory maximum term of imprisonment of 30 years. The parties agree that Adetiloye committed mail fraud. But the parties disagree about a number of sentencing factors, including Adetiloye's role in the offense; the number of victims; the amount of loss caused by the offense; and whether Adetiloye has accepted responsibility for his involvement in the mail fraud scheme.

There are two crucial factors that determine the length of the sentence recommended by the United States Sentencing Guidelines - the amount of the loss and the number of victims. The parties have spent most of their time devoted to these two issues. The United States calculates the amount of loss at approximately $5,000,000 over the duration of the scheme and the number of victims at greater than 250, while Adetiloye puts the loss that he should be responsible for at between $120,000 and $200,000 with the number of victims at less than 50. Thus, the parties disagreements on the sentencing guideline adjustments are completely at odds and paint two completely different pictures. In the following sections, the Court will analyze these two factors in addition to all of the other adjustments contained in the Presentence Investigation Report ("PSIR").

## DISCUSSION

A mail fraud conviction requires proof that the defendant: (1) voluntarily and intentionally devised or participated in a scheme to defraud; (2) entered into the scheme with intent to defraud; (3) knew it was reasonably foreseeable that the mails would be used; and (4) used the mails in furtherance of the scheme. United States v. Bearden, 265 F.3d 732, 736 (8th Cir. 2001). A government can establish a defendant committed the substantive offense of mail fraud without necessarily proving that the defendant agreed to join in a conspiracy so long as it proves the defendant "devised or participated" in a scheme to defraud in which the mails were used. Id. While conspiracy doctrines apply to multi-member mail fraud schemes, a defendant cannot be held accountable for mailings that occurred before he joined the scheme. United States v. Wormick, 709 F.2d 454, 461 (7th Cir. 1983); United States v. Bad Wound, 203 F.3d 1072, 1077 (8th Cir. 2000) (explaining that a person cannot be held liable for losses caused by other

2

conspirators in the scheme before the person joined the conspiracy). A defendant can, however, be held accountable for mailings caused by other members made in furtherance of the scheme, whether or not he know of or agreed to any specific mailing, once he becomes a party to the scheme. Id.

The United States asserts Adetiloye was involved in a fraud scheme beginning in 2004 (or at the latest in 2005) and continuing until 2009, which targeted medical professionals. As part of the scheme, the United States alleges Adetiloye: (1) created fraudulent business entities and obtained business licenses; (2) used the business licenses to gain access to commercial data providers who held personal identification information on individuals; (3) used that personal identification information to establish credit card and other bank accounts in other assumed identities; and (4) then conducted various transactions on the credit cards and accounts of unsuspecting individuals. The United States believes Adetiloye was the leader in every aspect of the fraud scheme.

Adetiloye paints a different picture of his involvement. He asserts that he joined a pre-existing fraud scheme and was never the organizer or leader of the scheme. Adetiloye contends the government has presented little evidence to allow the Court to find that the entire conspiracy was foreseeable to Adetiloye in 2006 when he joined it because, at that time, Adetiloye was only a "marginal and minimal" participant. Adetiloye further contends that his involvement in the scheme in 2007 was limited to picking up and delivering mail and ATM withdrawals, which is insufficient to find he was aware of the full scope of the scheme before he was arrested on December 1, 2007. As will be more fully explained below, the Court believes Adetiloye's involvement in this scheme is less than the United States contends and greater than Adetiloye

3

asserts it is.

## DISCUSSION

1.      **Involvement in the Scheme**

Investigation of this case began in 2006. The government contends that the fraud scheme began approximately two years earlier, on or about March 2004. The government believes that Adetiloye was involved in the fraud scheme from the beginning and was "the major play" in every aspect of this fraud scheme from 2006 to 2009.

In light of the evidence presented at the hearing, it is clear there are multiple participants in this scheme. The government has not charged any of the other participants and seeks to hold Adetiloye responsible for all of the acts of all the participants for the entire duration of the alleged conspiracy. The government's theory would be sustainable under the law if it was able to prove, by a preponderance of the evidence, that Adetiloye joined the scheme on or about March 2004. See Wormick, 709 F.2d at 461-62 (participant in a mail fraud scheme is accountable for mailings caused by other members made in furtherance of the scheme once he becomes a party to the scheme). The government has failed in its burden of proof. The record is simply devoid of evidence necessary to convince the Court to a preponderance of the evidence that Adetiloye devised and participated in this scheme beginning in March of 2004. There is, however, ample evidence to link Adetiloye to this fraud scheme beginning in the spring of 2006, when his fingerprints were found on documents used in the scheme. It is also clear that, by 2007, Adetiloye was actively involved in the scheme when he was photographed at ATMs withdrawing cash while using fraudulent credit or debit cards and was recorded making calls to renew phoney business licenses opened with fraudulently obtained identification cards and documents.

The Guidelines instruct that in conspiracy cases, adjustments "shall be determined on the basis of . . . all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." USSG § 3(a)(1)(B); United States v. McKanry, 628 F.3d 1010, 1020 (8th Cir. 2011). "Factors relevant to foreseeability include whether the defendant benefitted from his co-conspirator's activities and whether he demonstrated a substantial level of commitment to the conspiracy." United States v. Bad Wound, 203 F.3d 1072, 1076 (8th Cir. 2000) (quotation omitted).

Adetiloye was an active participant in the scheme to defraud banks and unsuspecting victims from the spring of 2006 until 2009. The evidence presented at the hearing demonstrated Adetiloye was substantially committed to the overall scheme and the acts of his co-conspirators were remarkably similar to the acts undertaken by Adetiloye in this fraud scheme, all of which benefitted Adetiloye in the theft of in excess of one million dollars. Adetiloye's actions and the actions of other participants in this scheme to defraud were within the scope of a joint activity, the acts were in furtherance of the scheme, and the acts were known to or reasonably foreseeable by Adetiloye. As such, Adetiloye is liable for the known or reasonably foreseeable losses the banks and credit cards incurred from the date his involvement in this scheme began until it was thwarted by investigators. United States v. Cain, 128 F.3d 1249, 1253 (8th Cir. 1997) (defendant cannot be liable for any fraudulent sales occurring before he joined the conspiracy).

**2.      Calculation of Amount of Loss**

The Eighth Circuit takes "a broad view of what conduct and related loss amounts can be included in calculating loss." United States v. Lewis, 557 F.3d 601, 614 (8th Cir. 2009) (quotation omitted). Under USSG § 2B1.1, "loss" means the greater of either "actual loss" or

5

"intended loss." United States v. Holthaus, 486 F.3d 451, 454 (8th Cir. 2007). "Actual loss" is "the reasonably foreseeable pecuniary harm that resulted from the offense." USSG § 2B1.1 cmt. n. 3(A)(i). "Intended loss" is the "pecuniary harm that was intended to result from the offense", including "harm that would have been impossible or unlikely to occur." USSG § 2B1.1 cmt. n. 3(A)(ii). "The government must prove the intended loss by a preponderance of the evidence." Id. (quoting United States v. Staples, 410 F.3d 484, 490 (8th Cir. 2005)). "The district court's method of calculating the amount of loss must be reasonable, but the loss need not be determined with precision." United States v. Miell, 661 F.3d 995, 1000 (8th Cir. 2011) (citation and quotation omitted).

In determining intended loss, courts consider a defendant's subjective intent. Id. (citing United States v. Hartstein, 500 F.3d 790, 798 (8th Cir. 2007)). In this case, the government characterizes Adetiloye's subjective intent broadly and contends that the Court should use the aggregate credit limits on all accounts to calculate attempted loss because any other method of calculation such as actual loss or attempted loss (actual loss plus unsuccessfully attempted charges) would unfairly minimize the intent of the scheme.[1] The government argues, and the PSIR contains, an 18-level upward adjustment for an amount of loss that is more than $2,500,000

---

[1] According to the evidence presented by the government, the attempted loss in this fraud scheme totals $2,783,362.69 and the loss calculated by aggregating the credit limits of the credit cards and accounts is $5,102,712.00. (Government's Evidentiary Hearing Exh. 207). Both of these amounts fall within the same category under the sentencing guidelines and, therefore, the Court need not resolve the open question in this Circuit of whether the credit limit is the appropriate method of calculating attempted loss. Other Circuits are split on this issue. See e.g., United States v. Manatau, 647 F.3d 1048, 1056-57 (10th Cir. 2011) ("a court cannot simply calculate 'intended loss' by toting up credit limits without any finding that the defendant intended to inflict a loss reasonably approaching those limits."); United States v. Harris, 597 F.3d 242, 259 (5th Cir. 2010) (district court did not err in calculating the defendant's intended loss as being equal to the credit limits of the credit cards compromised).

6

but less than $7,000,000. Adetiloye asserts that the appropriate loss should be measured in terms of the greater of the actual loss incurred or the actual loss plus attempted charges, which after considering his involvement, he believes fall in the $120,000 to $200,000 range of the guideline.

Turning to the advisory sentencing guideline for fraud cases, it provides for incremental increases when the loss exceeds $5,000. Relevant in this case are the following increments:

| Loss (Apply the Greatest) | | Increase in Level |
|---|---|---|
| * * * | | |
| (F) | More than $120,000 | add **10** |
| (G) | More than $200,000 | add **12** |
| (H) | More than $400,000 | add **14** |
| (I) | More than $1,000,000 | add **16** |
| (J) | More than $2,500,000 | add **18** |
| (K) | More than $7,000,000 | add **20** |

USSG § 2B1.1(b)(1). Application Note 3(F) to this section of the guidelines sets forth a rule for calculating losses associated with credit cards or bank accounts:

> (I) <u>Stolen or Counterfeit Credit Cards and Access Devices; Purloined Numbers and Codes</u>.–In a case involving any counterfeit access device or unauthorized access device, loss includes any unauthorized charges made with the counterfeit access device or unauthorized access device and shall be no less than $500 per access device. . . ."

The term "access device" includes credit cards and account numbers used to obtain money, goods, services or any other thing of value. <u>See</u> Application Note 9(A) and 18 U.S.C. § 1029(e)(1). An "unauthorized access device" is "any access device that is lost, stolen, expired, revoked, canceled, or obtained with intent to defraud". 18 U.S.C. § 1029(e)(3); <u>United States v. Kowal</u>, 527 F.3d 741, 748 (8th Cir. 2008).

The government presented evidence of over 500 credit card, debit card, and bank account numbers that it claims were obtained with intent to defraud financial institutions and individuals

7

who were the unsuspecting victims of this scheme. Although these access devices were subsequently linked to the fraudulent scheme by United States Postal Inspector Matthew J. Hoffman in cooperation with law enforcement officers in various cities and countries, bank investigators, and commercial mailbox companies, the government's evidence includes activity on credit cards and accounts that pre-date Adetiloye's involvement in the scheme. In particular, the opening of some of the accounts involving Discover Card, Bank of America, Bancorp, Chase, Citibank, Union Federal, and Wachovia occurred before Adetiloye joined in the scheme.

Additionally, the government has tied together the different transactions in a single scheme with connectors such as searching the unsuspecting victim in any of the commercial databases where a fraudulent account was obtained, using fictitious notary stamps, relying on the same photograph for two different forms of identification, forwarding mail from particular commercial mail receiving agencies ("CMRAs"), and using money orders to pay for CMRA mailboxes. While each one of these "connectors" appears to be part of the *res gestae* of the scheme, not all of the fraudulent transactions are tied into the scheme on multiple levels. Some of the transactions are tied simply through certain CMRAs, as there was no record of a search for identifying information in any of the commercial databases the participants were known to use. While some of the CMRAs are closely connected to this scheme (for example, tiers 1 and 2), others only popped up occasionally during the investigation (for example, tier 4). Similarly, some of the post office addresses, telephone numbers, identification cards, and credit cards connected by the government to this scheme are used less than a handful of times. Although it is possible they are part of the overall scheme, the Court cannot say to a preponderance of the evidence that they are part of the scheme Adetiloye agreed to jointly undertake.

After carefully reviewing all of the evidence submitted by the government and pursuant to § 2B1.1, Application Note 3(F)(I), the Court assesses a total loss value of $1,475,000.00, which includes intended bank losses plus $500.00 per access device where no specific loss could be determined. The Court finds this is the amount the government has demonstrated, by a preponderance of the evidence, was within the scope of the joint activity Adetiloye agreed to undertake, was in furtherance of the conspiracy, and was known to or reasonably foreseeable by Adetiloye. Accordingly, the government has established a 16-level adjustment under USSG § 2B1.1(b)(1)(I).

3.  **Number of Victims**

Adetiloye disputes the application in the PSIR of a 6-level upward adjustment for an offense involving 250 or more victims.[2] USSG § 2B1.1(b)(2)(C). He contends the actual number of victims is more than 10 but less than 50.

The guidelines recommend adjustments to the base offense level if the offense -

> (A) (i) involved 10 or more victims; or (ii) was committed through mass-marketing, increase by **2** levels;
>
> (B)   involved 50 or more victims, increase by **4** levels; or
>
> (C)   involved 250 or more victims, increase by **6** levels.

USSG § 2B1.1(b)(2).

For purposes of this section, the comments defined "victim" to mean "(A) any person

---

[2] A revised Presentence Investigation Report was filed on January 17, 2012. The revised report appears to reduce the 6-level enhancement for the number of victims to a 4-level enhancement. The Court is unaware of the basis for the adjustment by the PSIR writer. When the report was filed, the Court had already undertaken its own calculation of the number of victims and found that the number was between 50 and 250.

9

who sustained any part of the actual loss determined under subsection (b)(1); or (B) any individual who sustained bodily injury as a result of the offense." USSG § 2B1.1 cmt. n. 1. Actual loss under subsection (b)(1) includes "the reasonably foreseeable pecuniary harm that resulted from the offense." Id. at cmt. n. 3. "Reasonably foreseeable pecuniary harm" means "pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known was a potential result of the offense." Id.

While the language in § 2B1.1(b)((2) has not changed, a recent amendment to the guidelines now defines "victim" in cases involving "means of identification" as "any individual whose means of identification was used unlawfully or without authority." USSG § 2B1.1 cmt. n. 4 (E)(ii) (effective Nov. 2009). This new comment is contrary to Eighth Circuit precedent which has determined that "victims" under § 2B1.1 are only those who have sustained an "actual loss." United States v. Miller, 588 F.3d 560, 568-69 (8th Cir. 2009). The government concedes that the conduct at issue in this case arose before the amendment took effect and that it is possible that many of the people who would now be considered "victims" for purposes of this enhancement are not "victims" under Eighth Circuit law (Doc. #73, United States Sentencing Memorandum, p. 22).

The government has established that there are many companies, banks, and bank customers who were affected by Adetiloye's actions in this fraudulent scheme. With regard to the bank customers, the government compiled a list of all victims and the losses they sustained from the theft of their identity (Gov. Sentencing Exh. 207). A closer inspection of this exhibit reveals that of the 578 fraudulent accounts identified by the government, the banks/victims sustained an actual loss less than 45 percent of the time. Moreover, a number of these individuals were

10

victimized before Adetiloye joined the conspiracy and must be excluded when determining Adetiloye's recommended sentencing range.

There is no doubt that there are more than 250 individuals, banks, and companies affected by the participants' actions in this massive fraud scheme. The government, however, has failed to establish by a preponderance of the evidence that from the date Adetiloye joined the conspiracy, there are more than 250 victims, as defined by Eighth Circuit law. Rather, there is sufficient evidence to establish there was between 50 and 250 victims. The Court finds a four-level increase under USSG § 2B1.1(b)(2)(B) can be sustained by the evidence.

**4.    Committed Outside the United States**

The sentencing guidelines recommend a two-level increase if "a substantial part of a fraudulent scheme was committed from outside the United States." USSG § 2B1.1(b)(9)(B). Adetiloye resided in Canada during his involvement in the scheme. There was substantial evidence presented that many of the aspects of this scheme originated from Canada and that it likely reached to London. The Court finds the two-level increase is supported by the evidence.

**5.    Use of Authentication Features**

The sentencing guidelines recommend a two-level increase if the offense involves the possession or use of "authentication features". USSG § 2B1.1(b)(10). As part of this scheme, Adetiloye used the social security numbers, birth dates, and identities of other individuals to commit this offense. The entire scheme was premised on the use of authentication features fraudulently obtained by the co-conspirators. The Court finds the two-level increase is supported by the evidence.

**6.      Gross Receipts from Financial Institutions**

The guidelines recommend an adjustment to the base offense level if the defendant "derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense, increase by 2 levels." USSG § 2B1.1(b)(14). The comments make clear that the defendant must derive more than $1,000,000 in gross receipts individually, rather than the amount derived collectively by the participants. USSG § 2B1.1(b)(14)(A) cmt. n. 11.

There is little dispute that the participants in this scheme caused actual losses exceeding $1,000,000. There can be little dispute that there were other participants in this scheme, and, as the Court has already found, Adetiloye joined a pre-existing fraud scheme. There is no evidence to establish that Adetiloye personally received all of the monies obtained during this scheme, and even if Adetiloye was the "life blood" and received every dime after he joined the conspiracy, the actual losses are less than $1,000,000 during this time period. The government has failed to establish by a preponderance of the evidence that Adetiloye, individually, received in excess of $1,000,000 in gross receipts.

**7.      Organizer and Leader**

The sentencing guidelines recommend a four-level increase if "the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." USSG §3B1.1(a). Adetiloye contends the government failed to establish that he was an organizer or leader and that the Court should not infer that he directed the activities of others.

The terms "organizer" and "leader" are construed broadly. United States v. Bolden, 596 F.3d 976, 984 (8th Cir. 2010). In determining the applicability of this enhancement, a court should consider the defendant's decision making authority, the nature of his participation in the

12

commission of the offense, the recruitment of accomplices, the right to claim a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. Id. (quoting USSG § 3B1.1, cmt. n. 4). The enhancement is not limited to those who first instigated the criminal activity and there can be more than one organizer or leader of a conspiracy. Id.

In order for a defendant to be an organizer or leader of a criminal activity, he need only direct one other participant. United States v. Rodriguez-Ramos, 663 F.3d 356, 364-65 (8th Cir. 2011). Here, Adetiloye was recorded on the phone attempting to resolve issues that arose with certain commercial data providers or credit card companies. Thereafter, money or additional fraudulent documents would be mailed in an effort to remedy the problem. At times, the money or documents would come from within the United States when Adetiloye would claim he was not in the United States. The scheme was far to extensive for a single person to carry out every act. It is clear from the evidence presented at the hearing that there were other fingerprints found on the documents used in this scheme, photographs of other individuals were captured on surveillance tapes, and voices of other participants were recorded during telephone calls attempting to further the conspiracy. Whether the government can identify five or more participants that Adetiloye directed as part of the conspiracy is insignificant. There was ample evidence presented at the hearing to find that Adetiloye directed at least one other unnamed participant to assist him in mailing payments and completing fraudulent forms.

In assessing whether a scheme is otherwise extensive, a court should consider all people involved during the course of the conspiracy, including the use of unknowing outside service providers. United States v. Scott, 448 F.3d 1040, 1044 (8th Cir. 2006). This scheme

13

compromised the personal information of thousands of individuals. Access to this information stemmed from the creation of fraudulent business records. The participants in the scheme opened hundreds of accounts under the identities of unsuspecting victims. They used over 100 different CMRAs to facilitate their fraudulent acts. A substantial part of the activities were directed from outside the United States and thus the geographical reach of this scheme was larger than many this Court has seen.

Adetiloye's fingerprints were found on documents used in the scheme, his voice was recorded in phone calls that were made to further the participants' objectives, and his picture was captured on ATM surveillance cameras withdrawing money with fraudulently obtained cards. The nature of Adetiloye's participation in the scheme demonstrates he was more than a dupe in the process. The evidence indisputably demonstrates that Adetiloye was a leader or organizer of this extensive fraud scheme. The Court finds the evidence is sufficient to support the four-level increase under USSG § 3B1.1(a).

## 8.     Acceptance of Responsibility

The sentencing guidelines provide for a two-level downward adjustment to the sentencing range "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense." USSG § 3E1.1(a). A defendant who enters a plea is not entitled to acceptance of responsibility as a matter of right. United States v. Shade, 661 F.3d 1159, 1167 (8th Cir. 2011) (quotation omitted). A defendant bears the burden of proving that he is entitled to a reduction for acceptance of responsibility. United States v. Honken, 184 F.3d 961, 968 (8th Cir. 1999). The commentary to this section states that a court may consider whether the defendant truthfully admitted the conduct comprising the offense and truthfully admitted or did not falsely deny any

14

additional relevant conduct for which the defendant is accountable under USSG § 1.3.

Despite pleading guilty, Adetiloye has contested many factual statements in the PSIR and virtually all of the applicable enhancements. Some of the denials, including his claimed limited role in the offense and his extremely narrow construction of what conduct is reasonably foreseeable to him are unsupported by the record. Moreover, there is evidence indicating that Adetiloye took affirmative steps to develop a different writing style so as to avoid any legitimate comparison of handwriting samples obtained during the investigation with the court-ordered exemplars. Adetiloye has continually minimized or denied his role in the offense despite the overwhelming evidence against him.

Adetiloye has put the government to its burden of proof on virtually all of the sentencing issues by denying his involvement in the scheme. He has contested relevant conduct that the Court has determined to be true and acted in a manner inconsistent with acceptance of responsibility. The Court finds Adetiloye has not met his burden of proving he is entitled to a reduction for acceptance of responsibility under USSG § 3E1.1(a).

9.      **Departure Considerations**

The commentary to USSG § 2B1.1 identifies considerations that a court may contemplate when determining an appropriate sentence in a theft-based offense. USSG 2B1.1 cmt. n. 19. The comment notes: "[t]here may be cases in which the offense level determined under this guideline substantially understates the seriousness of the offense" and thus an upward departure is appropriate. Id. A court may consider, for example, whether the offense caused or risked substantial non-monetary harm such as a substantial invasion of a privacy interest; whether the offense created a risk of substantial loss beyond the loss determined for purposes of subsection

15

(b)(1); whether the offense caused substantial harm to the victim's reputation or credit record, or whether the victim suffered a substantial inconvenience related to repairing his or her's reputation or damaged credit record; and whether the defendant obtained numerous means of identification with respect to an individual and essentially assumed that individual's identity.

The scheme in this case was extensive. It involved the creation of fraudulent and fictitious business records in order to gain access to commercial data providers. After fraudulently obtaining accounts with several commercial data providers, the participants focused their searches on medical providers. The personal information of thousands of individuals was at risk. The participants stole the personal information of hundreds of individuals and opened accounts in their names. The non-monetary harm to the victims was substantial. As outlined in the PSIR, the victims who had their information stolen sustained a great deal of loss - they lost sleep, they lost time with their families, they lost time at work, and they lost their sense of security. Some victims spent hours trying to reclaim their credit record and their identities.

Moreover, despite the Court's calculation of loss, the offense created a risk of substantial loss beyond that which the Court has determined under subsection (b)(1). Even though the Court has calculated the loss at just less than $1.5 million, the risk of loss was substantially greater. The risk of loss could have exceeded $5 million. While the guidelines contemplate a number of considerations in an offense of this magnitude, they do not adequately account for the risk of loss and the non-monetary loss to the hundreds of victims involved in this extensive scheme. The Court finds an additional two-level upward departure is warranted.

## COURT-DETERMINED GUIDELINE RANGE

The Court, having resolved the parties' legal disputes to the PSIR, sets forth the

applicable advisory sentencing guideline range as follows:

| | | |
|---|---|---|
| Base Offense Level: | 7 | USSG § 2B1.1 |
| Specific Offense Characteristics: | +16 | USSG § 2B1.1(b)(1)(I) |
| | + 4 | USSG § 2B1.1(b)(2)(B) |
| | + 2 | USSG § 2B1.1(b)(9) |
| | + 2 | USSG § 2B1.1(b)(10) |
| | + 4 | USSG § 3B1.1(a)) |
| Upward Departure: | + 2 | |
| Adjusted Offense Level: | **37** | |
| Criminal History Category: | I | |
| Advisory Sentencing Range: | **210 - 262** | |

The parties' objections to the sentencing range are preserved in the record. The government's request for any additional guideline-based upward departures or variances is denied. Factual objections to the PSIR will be addressed at the sentencing hearing on January 23, 2012, as well as consideration of the factors under 18 U.S.C. § 3553(a). Any party may submit a sentencing memorandum addressing issues not raised in this Order not later than **Noon,** on **Friday, January 20, 2012**.

**IT IS SO ORDERED.**

Dated this 18th day of January, 2012.

/s/ Ralph R. Erickson  
Ralph R. Erickson, Chief Judge  
United States District Court